**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

_____

| | |
|---|---|
| Carol A. Rhamy, on behalf of herself and all others similarly situated, | : Civil Action No. |
| | : |
| | : |
| Plaintiff, | : <u>Class Action Complaint</u> |
| | : |
| vs. | : <u>Jury Trial Demanded</u> |
| | : |
| FIDELITY NATIONAL TITLE INSURANCE | : |
| COMPANY, CHICAGO TITLE INSURANCE | : |
| COMPANY, TICOR TITLE INSURANCE | : |
| COMPANY, SECURITY UNION TITLE | : |
| INSURANCE COMPANY, TICOR TITLE | : |
| INSURANCE COMPANY OF FLORIDA, | : |
| FIDELITY NATIONAL FINANCIAL, INC., | : |
| FIRST AMERICAN TITLE INSURANCE | : |
| COMPANY, UNITED GENERAL TITLE | : |
| INSURANCE COMPANY, OHIO BAR TITLE | : |
| INSURANCE COMPANY, PORT LAWRENCE | : |
| TITLE AND TRUST COMPANY, T.A. TITLE | : |
| INSURANCE COMPANY, CENSTAR TITLE | : |
| INSURANCE COMPANY, FIRST AMERICAN | : |
| CORPORATION, COMMONWEALTH LAND | : |
| TITLE INSURANCE COMPANY, LAWYERS | : |
| TITLE INSURANCE CORPORATION, | : |
| TRANSNATION TITLE INSURANCE | : |
| COMPANY, LANDAMERICA FINANCIAL | : |
| GROUP, INC., STEWART TITLE GUARANTY | : |
| COMPANY, NATIONAL LAND TITLE | : |
| INSURANCE COMPANY, STEWART | : |
| INFORMATION SERVICES CORPORATION, | : |
| OLD REPUBLIC NATIONAL TITLE | : |
| INSURANCE COMPANY, OLD REPUBLIC | : |
| INTERNATIONAL CORPORATION, and | : |
| THE OHIO TITLE INSURANCE RATING | : |
| BUREAU, INC., | : |
| | : |
| Defendants | : |

_____:

Plaintiff, Carol A. Rhamy, by her attorneys, on behalf of herself and all others similarly situated, brings this action for treble damages and injunctive relief under the antitrust laws of the United States against the above named defendants, demands a trial by jury, and complains and alleges as follows:

I.

JURISDICTION AND VENUE

1.      This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the class which he represents by reason of defendants' and their co-conspirators' violations, as hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. §1).

2.      Defendants transact business, maintain offices or are found within the Northern District of Ohio.  The interstate commerce described hereinafter is carried on, in part, within the Northern District of Ohio and the conspiratorial acts herein alleged were carried on, in part, in the Northern District of Ohio.

II.

PLAINTIFF

3.      Plaintiff, Carol A. Rhamy, is an individual residing in the State of Ohio.  During the Class period, plaintiff purchased title insurance directly from one or more of the defendants herein, and has been injured by reason of the antitrust violations alleged.

III.

DEFENDANTS

4.      The Fidelity family of title insurance companies (collectively, "Fidelity") – which includes defendant Fidelity National Title Insurance Company ("Fidelity Title"), defendant Chicago Title Insurance Company ("Chicago Title"), defendant Ticor Title Insurance Company ("Ticor Title"), defendant Security Union Title Insurance Company ("Security Union Title"), defendant Ticor Title Insurance Company of Florida ("Ticor Title Florida"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Ohio.  Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion.  Fidelity Title, Chicago Title, Ticor Title, Security Union Title and Ticor Title Florida are members of The Ohio Title Insurance Rating Bureau, Inc. ("OTIRB"), and have charged title insurance rates in Ohio that OTIRB collectively sets.

5.      Fidelity Title, Chicago Title, Ticor Title, Security Union Title, Ticor Title Florida and their affiliates are wholly-owned and controlled by defendant Fidelity National Financial, Inc. ("Fidelity National"), a Delaware corporation headquartered in Jacksonville, Florida. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services.  Fidelity National had 2006 revenues of roughly $9.4 billion. Fidelity engaged in the conduct challenged herein with the approval and assent of Fidelity National.

6.      The First American family of title insurance companies (collectively, "First American") – which includes defendant First American Title Insurance Company ("First American Title"), defendant United General Title Insurance Company ("United General Title"),

defendant Ohio Bar Title Insurance Company ("Ohio Bar Title"), defendant Port Lawrence Title and Trust ("Port Lawrence Title"), defendant T.A. Title Insurance Company ("T.A. Title"), defendant Censtar Title Insurance Company ("Censtar Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Ohio.  Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion.  First American Title, United General Title, Ohio Bar Title, Port Lawrence Title, T.A. Title, and Censtar Title are members of OTIRB and have charged title insurance rates in Ohio that OTIRB collectively sets.

7.    First American Title, United General Title, Ohio Bar Title, Port Lawrence Title, T.A. Title, Censtar Title, and their affiliates are wholly-owned and controlled by defendant First American Corporation ("FAC"), a California corporation headquartered in Santa Ana, California.  Through its subsidiaries, FAC is a provider of title insurance, business information, and related products and services.  FAC had 2006 revenues of roughly $8.5 billion.  First American engaged in the conduct challenged herein with the approval and assent of FAC.

8.    The LandAmerica family of title insurance companies (collectively, "LandAmerica") – which includes defendant Commonwealth Land Title Insurance Company ("Commonwealth"), defendant Lawyers Title Insurance Corporation ("Lawyers Title"), defendant Transnation Title Insurance Company ("Transnation"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Ohio.  Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.  Commonwealth, Lawyers Title, and Transnation are members of OTIRB and have charged title insurance rates in Ohio that OTIRB collectively sets.

4

9.     Commonwealth, Lawyers Title, and Transnation are wholly-owed and controlled by defendant Land America Financial Group, Inc. ("LAFG"), a Virginia corporation headquartered in Glen Allen, Virginia.  Through its subsidiaries, LAFG is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.  LAFG had 2006 revenues of roughly $4 billion.  LandAmerica engaged in the conduct challenged herein with the approval of LAFG.

10.    The Stewart family of title insurance companies (collectively, "Stewart") – which includes defendant Stewart Title Guaranty Corporation ("Stewart Title"), defendant National Land Title Insurance Company ("National Land Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Ohio.  Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion.  Stewart Title and National Land Title are members of OTIRB and have charged title insurance rates in Ohio that OTIRB collectively sets.

11.    Stewart Title and National Land Title are wholly-owned and controlled by defendant Stewart Information Services Corporation ("SISC"), a Delaware corporation headquartered in Houston, Texas.  Through its subsidiaries, SISC is a provider of title insurance and related information and post-closing lender services.  SISC had 2006 revenues of roughly $2.5 billion.  Stewart engaged in the conduct challenged herein with the approval and assent of SISC.

12.    The Old Republic family of title insurance companies (collectively "Old Republic") – which includes defendant Old Republic National Title Insurance Company ("Old Republic Title" and its affiliates – is engaged in selling title insurance to purchasers of

commercial and residential real estate throughout the United States, including Ohio.  Nationally, Old Republic accounts for approximately 6 percent of title premiums, which in 2006 amounted to roughly $1 billion.  Old Republic Title is a member of OTIRB and has charged title insurance rates in Ohio that OTIRB collectively sets.

13.     Old Republic Title and its affiliates are wholly owned and/or controlled by defendant Old Republic International Corporation ("Old Republic International"), a Delaware corporation headquartered in Chicago, Illinois.  Through its subsidiaries, Old Republic International is a provider of title insurance, general insurance, mortgage guaranty insurance, and life and health insurance.  Old Republic International had 2006 revenues of roughly $3.8 billion.  Old Republic engaged in the conduct challenged herein with the approval and assent of Old Republic International.

14.     Together, Fidelity, First American, Land America, Stewart and Old Republic account for more than 95 percent of the title premiums consumers pay in Ohio, which in 2006 amounted to roughly $426 million.  Throughout the relevant damages period, defendants charged Ohio consumers identical title insurance rates that were collectively set through OTIRB.

15.     Defendant OTIRB is an Ohio not-for-profit corporation, authorized to conduct business and conducting business in the State of Ohio, with its principal place of business in Columbus, Ohio.  OTIRB is licensed by the Ohio Department of Insurance pursuant to Sections 3935.04 and 3953.28 of the Ohio Revised Code.

16.     OTIRB's Articles of Incorporation, filed July 29, 1991, state that OTIRB was formed, in part, "[t]o make and publish underwriting classifications of risks, policy provisions and other forms, manual rates, minimum charges and rating plans in accordance with the Insurance Laws of the State of Ohio."  In addition, OTIRB functions to "obtain, compile and

analyze such statistical and other data and information as may be necessary or appropriate in connection with rate-making operations," and "[t]o file with the Ohio Department of Insurance, on behalf of members and subscribers, such forms as may be authorized by each member and subscriber."

17.     OTIRB is authorized to compile from its members statistical data relating to their title insurance premiums, losses and expenses, and submit this information in aggregate form to the Insurance Department.  OTIRB also prepares and submits the Schedule of Rates for Title Insurance in the State of Ohio, which sets forth title rates to be charged and rules to be followed by OTIRB's members.

18.     OTIRB's membership is comprised of defendant insurers and other title insurers that are licensed to issue policies in Ohio.  Currently, Fidelity, First American, Land America, Stewart, and Old Republic collectively represent 17 of OTIRB's 30 members;  both of OTIRB's 2 "Rates Committee" members;  and 4 of OTIRB's 6 "Officer" positions.  As such, they comprise a majority voting block which allows them to control the operations of OTIRB and, in particular, OTIRB's collective rate setting activity.

IV.

<u>CO-CONSPIRATORS</u>

19.     Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

V.

DEFINITIONS

20.     As used herein, the term "Class period" shall mean the time period commencing

four years prior to the date of filing of this suit.

VI.

CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action under Rule 23, and particularly subsection (b) (3), of

the Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons

excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who

purchased directly, from one or more of the defendants and/or their co-conspirators, title

insurance for residential and commercial property in the State of Ohio during the period in suit

and who have sustained damages as a result of the conspiracy herein alleged.  The number of

potential Class members is so numerous that joinder is impracticable.

22.     Plaintiff, as representative of the Class, will fairly and adequately protect the

interest of the Class members.  The interests of the plaintiff are coincident with, and not

antagonistic to, those of the Class members.

23.     Except as to the amount of damages each member of the Class has by itself

sustained, all other questions of fact and law are common to the Class, including but not limited

to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman

Act (15 U.S.C. §1) and the effects of such violation.

24.     The questions of law and fact common to the members of the Class predominate

over any questions affecting only individual members of the Class, and a class action is superior

to other available methods for the fair and efficient adjudication of the controversy in that,

among other things, there is no interest by members of the Class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding in order to provide small claimants with a forum in which to seek redress for this antitrust violation.  Whatever difficulties may exist in the management of the class action will be greatly outweighed by the class action procedure, including, but not limited to, providing claimants with a method for the redress of claims which may not otherwise warrant individual litigation.

VII.

TRADE AND COMMERCE

25.     During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in the State of Ohio.

26.     During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce.

27.     During the period in suit, Class members from locations outside the State of Ohio purchased commercial or residential property and title insurance within Ohio.

28.     During the Class period in suit, the defendants were the major sellers of title insurance in the United States and the State of Ohio.  Defendants controlled in excess of 90 percent of the market for title insurance in the United States and more than 95 percent of the market for title insurance in the State of Ohio.  Total sales of title insurance by defendants exceeded $405 million in Ohio in 2006.

29.     The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

9

VIII.

<u>VIOLATIONS ALLEGED</u>

30.     Beginning at least as early as March 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

31.     The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

        (a)     to fix, raise, maintain and stabilize the price of title insurance throughout the State of Ohio; and,

        (b)     to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in the State of Ohio.

32.     Title insurance is one of most costly items associated with the closing of a real estate transaction.  In Ohio, OTIRB's collectively fixed rates for title insurance are based on a percentage of the total value of the property being insured.  For lenders' policies on residential properties, this price ranges from about $925 (for a $250,000.00 policy) to $2,675 (for a $1 million policy).  For homeowners' policies on residential properties, title insurance rates range from $1,312.50 (for a $250,000 policy) to $3,562.50 (for a $1 million policy).  For more expensive homes and commercial properties, these prices are significantly higher and can reach the tens of thousands of dollars.  In 2006 alone, Ohio consumers paid roughly $426 million for title insurance, most of which went to defendants and their affiliates.

10

33.     Title insurance serves an important purpose.  It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property.  In Ohio, title insurance is required by lenders in most residential and commercial real estate transactions.

34.     Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance.  That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor.   Consequently, for most purchasers, the cost of title insurance is largely overlooked and seldom, if ever, challenged.  Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction.  There is no shopping around.  There is no negotiation of price.

35.     This dynamic basically removes the sale of title insurance from the normal competitive process.  Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints.  The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions.  And, they are certainly in no position to question the price.

36.     The most effective way for a particular title insurer to get business is to encourage those making the purchasing decisions – the lawyers, brokers, lenders – to steer business to that insurer.  The best way to so motivate these third-party representatives is not through lower prices (that they are not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, and other financial enticements.  Therefore, it is through higher pricing (which allows for this third-party consideration), not lower pricing, that provides the best way for title insurers to compete and increase their business.

11

37.     Ohio Revised Code § 3935.03(B), which regulates title insurance, specifically states that such title insurance rates "shall not be excessive, inadequate, or unfairly discriminatory." The Ohio Superintendent of Insurance is obligated to review title insurance rate filings as soon as reasonably possible after they have been made in order to determine whether they meet these requirements. Ohio Rev. Code § 3935.04(C).

38.     Ohio is only one of a very small number of states in which the leading title insurers collectively fix and file their prices through a rate-setting organization like OTIRB. This is authorized by Section 3935.04 of the Ohio Revised Code. There should be one cost component that goes into OTIRB's calculation. That component is the risk associated with issuing the title policy.

39.     The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because title insurance protects against *prior* events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy amounts to less than 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

40.     Services performed by title agents in connection with the issuance of title insurance and property settlements, including charges for title search, title examination, closing, or escrow services, are not included in the rates set by OTIRB for title insurance. Instead, title agents impose separate charges for each of these services performed.

12

41.     Despite the separate provision of fees for services performed, the bulk of the premiums agreed upon and submitted to Ohio's Department of Insurance by OTIRB consist of costs unrelated to the issuance of title insurance, including kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use.  These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

42.     OTIRB publishes its final calculated title rates in the Schedule of Rates for Title Insurance in the State of Ohio.  These rates are tied to the value of the property being insured.  This is so despite the fact that the premiums associated with title insurance are entirely unrelated to the value of the property.  Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value – proportional to property value or otherwise – to the consumer.

43.     In *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621 (1992), the Supreme Court held that, in order to be immune from liability for price-fixing, title insurance rate-setting bureaus had to be actively supervised by state agencies.  Following the Supreme Court's instruction in *Ticor*, the Third Circuit, on remand in *Ticor Title Ins. Co. v. FTC,* 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state.  According to the Circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough.  Active supervision requires the state regulatory authorities' independent review and approval."  *Id.* at 1139.

13

44.     Through OTIRB, defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*.  They have done so by calculating a single rate that comprises both the premium for the title insurance and the kickbacks, financial inducements and other funds channeled to the title agents.  In this way, these funds, which are in no way related to title insurance or to various tasks for which title agents and others are separately remunerated, are hidden from the Insurance Department.

45.     Defendants' design in all of this has been to effectively "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

46.     In a report dated April 13, 2007, *Title Insurance: Actions needed to Improve Oversight of the Title Industry and Better Protect Consumers,* GAO-07-401, the U.S. Government Accountability Office ("GAO") stated that the title insurance industry is in need of greater state regulation.  The GAO studied the industry conditions of several states, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations,* needed to analyze premium prices and underlying costs."  (Emphasis added.)

47.     Defendants have been able to take advantage of the limited resources which Ohio's Department of Insurance can allocate to regulate title insurance rates.  That department has no separate administrative title insurance section and has no certified public accountant assigned to systematically review the information provided by OTIRB or demand additional information in support of OTIRB's filed rates.  Ohio's Department of Insurance personnel are largely tasked with monitoring and regulating the major insurance products, such as health, life,

auto, and fire and casualty insurance rates. Title insurance represents approximately 1 percent of the Ohio insurance business.

48.     Ohio's Department of Insurance has never subjected Defendants to any accounting analysis designed to determine whether OTIRB's filed title insurance rates conform to the regulatory requirements that they be reasonable, not excessive, and non-discriminatory. Nor have Defendants been required to provide to the Department of Insurance any statistical data, such as data about actual loss payments and loss administration, to support their rate-making operations.

49.     Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supracompetitive levels and earn profits that vastly exceed those contemplated by the Ohio Department of Insurance or that would have resulted in a free and open competitive market.

50.     Those defendants who are Ohio licensed title insurance companies are competitors in the sale of title insurance to consumers in Ohio. Through OTIRB, these title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance in Ohio, (ii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iii) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents.

51.     In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance in Ohio and is a *per se* violation of Section 1 of the Sherman Act.

52.     Defendants' price-fixing activity has been continuous throughout the relevant damages period and has been renewed and reinforced through OTIRB's submissions to the Ohio

Department of Insurance of supposed cost and revenue information and its periodic submissions of rate changes.

53.     Through their collective price-fixing and manipulation of the regulatory process, defendants have harmed competition by charging consumers supracompetitive prices for title insurance in Ohio.

IX.

EFFECTS

54.     The aforesaid combination and conspiracy has had the following effects among others:

(a)     price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b)     prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and,

(c)     purchasers of title insurance have been deprived of the benefit of free and open competition.

X.

DAMAGES

55.     During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such than it would have paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has been injured and damaged in an amount presently undetermined.

XI.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands:

(a)     That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

(b)     That judgment be entered against defendants, jointly and severally, and in favor of plaintiff, and each member of the Class she represents, for threefold the damages determined to have been sustained by plaintiff, and each member of the Class she represents, together with the cost of suit, including a reasonable attorneys' fee;

(c)     Each of the defendants, successors, assignees, subsidiaries and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition; and,

(d)     Such other and further relief as may be necessary and appropriate.

Dated this 24th day of March, 2008.

_____s/Gerald J. Rodos_____

Gerald J. Rodos
Jeffrey B. Gittleman
**BARRACK, RODOS & BACINE**
Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA 19103
Phone: (215) 963-0600
Fax:  (215) 963-0838
JGITTLEMAN@barrack.com
GRODOS@barrack.com

____s/Brian P. Kopp_____

Brian P. Kopp (0064897)
**Betras, Maruca, Kopp & Harshman, LLC**
6630 Seville Drive
Canfield, Ohio 44406
Phone: (330) 746-8484
Fax:  (330) 702-8280
bkopp@bhlaws.com